IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**CHARLESTON DIVISION**

GLENNIS JENE DILLARD,

     Plaintiff,

v.                                                                    CIVIL ACTION NO. 2:20-cv-00541

ANDREW SAUL,
Commissioner of Social Security,

     Defendant.

## PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Glennis Jene Dillard ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. (ECF No. 1.) By standing order entered on January 4, 2016, and filed in this case on August 13, 2020, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Claimant's brief in support of his social security appeal (ECF No. 11) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 12-1).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Claimant's request to reverse the Commissioner's decision (ECF No. 11), **DENY** the

Commissioner's request to affirm his decision (ECF No. 12-1), **REVERSE** the final decision of the Commissioner, and **REMAND** this action for further proceedings.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 56 years old at the time of his alleged disability onset date and 58 years old on the date of the decision by the Administrative Law Judge ("ALJ").  (*See* Tr. at 247.)[1]  He is a high school graduate.  (*Id.* at 252.)  Most recently, he worked as a self-employed chimney sweep and masonry contractor.  (*Id.*)  Claimant alleges that he became disabled on February 28, 2017, due to "heart, 2 stents," a sprained ankle, an injured back, "can't stand long due to back," high blood pressure, kidney stones, and arthritis in his fingers, knees, and back.  (*Id.* at 251.)

Claimant protectively filed his application for benefits on July 5, 2017.  (*Id.* at 229–37.)  His claim was initially denied on September 18, 2017, and again upon reconsideration on February 9, 2018.  (*Id.* at 146–50, 152–54.)  Thereafter, on August 29, 2018, Claimant filed a written request for hearing.  (*Id.* at 158–60.)  An administrative hearing was held before an ALJ on September 12, 2019, in Beckley, West Virginia, with the ALJ appearing from Charleston, West Virginia.  (*Id.* at 83–123.)  On October 22, 2019, the ALJ rendered an unfavorable decision.  (*Id.* at 64–82.)  Claimant then sought review of the ALJ's decision by the Appeals Council on October 30, 2019.  (*Id.* at 225–28.)  The Appeals Council denied Claimant's request for review on June 25, 2020, and the ALJ's decision became the final decision of the Commissioner on that date.  (*Id.* at 1–7.)

Claimant timely brought the present action on August 13, 2020, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).  (ECF No. 1.)  The

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 10.

Commissioner filed an Answer (ECF No. 9) and a transcript of the administrative proceedings (ECF No. 10). Claimant subsequently filed his brief in support of his social security appeal (ECF No. 11), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 12-1). As such, this matter is fully briefed and ready for resolution.

### B. Relevant Medical Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

#### 1. Treatment for Physical Impairments During Relevant Period

About two months after the alleged onset of his disability, on May 10, 2017, Claimant presented to his primary care physician and reported that he "fell a couple of months ago [when he] slipped on a rock while walking in the woods" and sprained his right ankle and hurt his back. (Tr. at 409.) A physical examination was normal. (*Id.* at 410–11.) Claimant's primary care physician ordered imaging of his thoracic and lumbar spine and right ankle. (*Id.* at 411.) The thoracic spine imaging was "negative for acute bony injury," and the lumbar spine imaging revealed "mild degenerative bony changes" but was also "negative for acute bony injury." (*Id.* at 343–44 (emphasis deleted).) The right ankle imaging was likewise "negative for acute bony injury." (*Id.* at 345 (emphasis deleted).)

Claimant began a course of physical therapy for his back pain on June 5, 2017, and he told the physical therapist that his back pain began twenty years prior after a motor vehicle accident but had resolved over time until he fell on February 28, 2017, his alleged onset date. (*Id.* at 381.) Claimant related that his symptoms "have not completely

resolved since onset though have decreased some '50%'," and he stated that his pain limited his abilities to sit, stand, bend, rotate his spine, and lift. (*Id.*) He rated his pain a nine that day and told the physical therapist that it was aggravated by sitting, standing, walking, going up and down stairs, moving from sitting to standing, bending, lifting, and climbing ladders. (*Id.*) After some mobility testing, the physical therapist concluded that Claimant's "S[ymptoms]/signs appear to correlate greatest with [left] posterolateral LV5-SV1 discal protrusion creating gradually evolving probable S1 radiculopathy." (*Id.* at 383.) He recommended that Claimant attend two sessions per week for six to eight weeks and rated his rehabilitation potential "Fair." (*Id.* at 383–84.)

Two days later, on June 7, 2017, Claimant presented to his cardiologist for a routine appointment. (*Id.* at 623.) A physical examination was normal. (*Id.* at 625.) The cardiologist ordered cardiac testing. (*Id.* at 626.) A carotid Doppler study from June 22, 2017, was "negative for a hemodynamically significant stenosis in either internal carotid artery." (*Id.* at 346 (emphasis deleted).) A stress test performed on July 25, 2017, was negative and showed no evidence of ischemia, and cardiac imaging from that same day was normal, with "no significant photon deficiency," no ischemia or infarction, and normal ejection fraction at 60%. (*Id.* at 349, 619–20 (emphasis deleted).)

In the meantime, on June 12, 2017, Claimant again reported back and right ankle pain to his primary care physician, but a physical examination was normal. (*Id.* at 402, 404–05.) At Claimant's sixth physical therapy session on June 22, 2017, the physical therapist noted that Claimant's left lower extremity symptoms were "now absent," but he "[n]eeds to improve core stabilization qualities for greatest long term benefit." (*Id.* at 371.) However, on July 3, 2017, Claimant told the physical therapist that his pain returned after he drove a motor vehicle with a standard transmission. (*Id.* at 367.)

Claimant returned to his primary care physician on July 12, 2017, and continued to complain of back pain. (*Id.* at 397.) A physical examination was again normal. (*Id.* at 399–400.) The primary care physician ordered imaging of Claimant's lumbar spine, which was performed on July 20, 2017, and revealed no "evidence for compromise of the cord, conus medullaris, thecal sac, or exiting nerves," but "mild degenerative changes [were] evident," and there was "disc dessication noted at L3/L4." (*Id.* at 347, 401 (emphasis deleted).) "The vertebral body heights [were noted to be] intact," "a disk herniation [was] not seen," and there was "no evidence for an acute extrusion of disk material into a lateral recess at any level." (*Id.* (emphasis deleted).)

At his next appointment with his primary care physician on August 14, 2017, Claimant stated that his back was "getting better but any activity flares pain radiating into left hip." (*Id.* at 445.) The primary care physician remarked, "I think he is at high risk for reinjury and falling at trial return to work with his current symptoms." (*Id.*) He recommended that Claimant continue physical therapy "for work conditioning and hardening and anticipate full return to work in 2 months – Oct. 15." (*Id.*) A physical examination was normal. (*Id.* at 446–47.) Imaging of Claimant's thoracic spine dated September 1, 2017, revealed "mild disk bulging with minor cord flattening." (*Id.* at 444 (emphasis deleted).)

At his eighteenth physical therapy session on September 7, 2017, the physical therapist noted that Claimant's "Weight levels tolerance remains far below required levels in work demands." (*Id.* at 387.) That day, he observed that Claimant could lift and carry fifteen pounds and pull twenty pounds. (*Id.*) By his final session on September 11, 2017, the physical therapist remarked, "Exhibits poor tolerance for ability to increase weight levels in Material Handling Activities above 15# for Lifting/Carrying & any weight level

above 20# for pulling." (*Id.* at 396.)  He stated that Claimant could not at that time tolerate the physical work duties and driving necessary to perform his job as a chimney sweep. (*Id.*)  Several days later, on September 14, 2017, Claimant presented to his primary care physician, and the physician remarked, "Pt. has gone through work conditioning – and still not able to pick up more than 20 lbs. and is disabled most likely permanently from doing his job." (*Id.* at 440.)  He recommended that Claimant see a pain management specialist and a chiropractor. (*Id.*)  A physical examination was normal. (*Id.* at 441–42.) Claimant had roughly twice-weekly sessions with the chiropractor from September 19, 2017, until November 10, 2017. (*Id.* at 914–31.)

Claimant presented to the pain management specialist for the first time on October 6, 2017, and described his back pain as intermittent, aching, and sharp, sometimes causing muscle spasms. (*Id.* at 678.)  He stated that "prolonged standing, walking, sitting, cough/sneezing" aggravated the pain and that it "worse[ned] as the day goes on." (*Id.* at 679.)  He rated his pain "3/10 today." (*Id.*)  Upon physical examination, the pain management specialist observed that Claimant walked with an antalgic gait in a "forward flexed posture" but had normal muscle strength and tone in his lower extremities, normal sensation and reflexes, and normal coordination. (*Id.* at 680–81.)  His lumbar spinal range of motion was limited on extension and rotation, he was positive for lumbar facet loading with hyperextension and rotation, facet tenderness, and myofascial tenderness, and his lower back and bilateral knees were tender to palpation. (*Id.* at 681.)  The pain management specialist prescribed spinal facet injections and directed Claimant to continue chiropractic treatment and his medications and to walk "as tolerated." (*Id.* at 681–82.)  When Claimant returned to his primary care physician on October 19, 2017, he reported that he "is doing some better with chiropractor treatment and to have facet nerve

blocks in November." (*Id*. at 433.) A physical examination was normal. (*Id*. at 435–36.) At his next appointment with his primary care physician on November 20, 2017, Claimant reported that the facet nerve blocks "helped some" and he "Can stand on feet better and moves some better." (*Id*. at 428.) A physical examination was normal. (*Id*. at 430–31.)

In the meantime, Claimant presented to a neurosurgeon on November 9, 2017, for a consultation. (*Id*. at 688.) He stated that "He feels like there is a 'knuckle' in his upper back," and "He has pressure in his lower back as well." (*Id*.) He related that twice-weekly chiropractic treatment had improved his pain by 40%, but physical therapy increased his pain. (*Id*.) Claimant also stated that "walking 10-15 minutes . . . standing in place, lifting and going up and down stairs" aggravated his symptoms and "leaning on something, sitting on soft chairs or lying supine" decreased them. (*Id*.) A physical examination was normal. (*Id*. at 690–91.) The neurosurgeon recommended that Claimant return for a follow-up appointment in six months for testing "to rule out worsening signal change which might indicate" "a vascular abnormality." (*Id*. at 691–92.)

When Claimant returned to his neurosurgeon on May 14, 2018, he stated that "He feels his pain is better controlled . . . but he feels his leg strength has deteriorated." (*Id*. at 695.) He also complained of increased numbness in his feet. (*Id*.) A physical examination was normal aside from "Clonus trace bilat[erally]." (*Id*.) The provider ordered imaging of Claimant's thoracic spine. (*Id*. at 696.) Claimant also presented to his primary care physician on May 14, 2018, and a physical examination was normal. (*Id*. at 786–87.)

Claimant next presented to his cardiologist on June 6, 2018, for a routine appointment, and he "denies any current symptoms." (*Id*. at 645.) A physical examination was normal. (*Id*. at 647.) The cardiologist ordered a carotid duplex study,

which was performed on June 12, 2018, and was "negative for a hemodynamically significant stenosis in either internal carotid artery." (*Id*. at 644, 648 (emphasis deleted).)

Claimant returned to his primary care physician on August 20, 2018, complaining of knee pain and stating that "at night legs bother him and he has to move his legs a lot." (*Id*. at 797.) A physical examination was normal. (*Id*. at 799–800.) Imaging of Claimant's knees taken that day was also normal. (*Id*. at 802–03.) At Claimant's next appointment with his primary care physician on September 20, 2018, he complained of right groin pain that was "worse when gets up and moves." (*Id*. at 806.) A physical examination was normal aside from tenderness to palpation in Claimant's right epididymis. (*Id*. at 808–09.) The physician diagnosed Claimant with epididymitis and prescribed an antibiotic. (*Id*. at 809–10.)

On September 28, 2018, Claimant presented to the emergency department at a local hospital, complaining of chest pain. (*Id*. at 463.) Imaging of his chest was negative. (*Id*. at 482.) Still, he was admitted to the hospital in stable condition. (*Id*. at 465.) The following day, he told the attending physician that "His chest pain was relieved and has not recurred" since he was given nitroglycerin, but it caused a headache. (*Id*. at 471.) A physical examination was normal. (*Id*. at 472.) An echocardiogram revealed normal ejection fraction and was unremarkable aside from "very mild mitral valve regurgitation." (*Id*. at 484 (emphasis deleted).) Claimant was discharged on September 30, 2018, "Stable and free of chest pain," with orders to undergo a cardiac stress test. (*Id*. at 474.)

On October 22, 2018, Claimant underwent a normal nuclear stress test and a negative electrocardiogram. (*Id*. at 642.) About a week later, on October 30, 2018, he presented to his cardiologist for an evaluation of his chest pain. (*Id*. at 638.) A physical examination was normal. (*Id*. at 640.) The cardiologist prescribed medication and

directed Claimant to return in six weeks.  (*Id.* at 641.)  On November 5, 2018, Claimant presented to his primary care physician and reported that he had "no more chest pains" but did have "some headaches."  (*Id.* at 827.)  A physical examination was normal aside from tenderness to palpation in Claimant's right epididymis.  (*Id.* at 828–29.)  When Claimant returned to his cardiologist on December 12, 2018, he "denie[d] any current symptoms" aside from headaches caused by his medication.  (*Id.* at 634.)  A physical examination was normal.  (*Id.* at 636–37.)  The cardiologist switched Claimant's medication.  (*Id.* at 637.)

Claimant next presented to his primary care physician on February 6, 2019, and reported "intermittent" abdominal pain.  (*Id.* at 848.)  The physician noted that Claimant had been treated at his "last visit for prostate infection and improved."  (*Id.*)  A physical examination was normal.  (*Id.* at 850–51.)  Several days later, on February 12, 2019, Claimant underwent a carotid Doppler ultrasound that was "borderline for a 60% stenosis, right internal carotid."  (*Id.* at 855 (emphasis deleted).)  When Claimant returned to his primary care physician on March 11, 2019, he and his physician discussed the ultrasound, and Claimant indicated that he would like to repeat the ultrasound in six months, which the primary care physician remarked "is reasonable."  (*Id.* at 894.)  A physical examination was normal.  (*Id.* at 896–97.)  At his next appointment with his primary care physician on April 17, 2019, Claimant complained of "generalized stiffness" in the right side of his neck, but a physical examination was again normal.  (*Id.* at 899, 901–02.)

On June 10, 2019, Claimant presented to his cardiologist and complained of dizziness.  (*Id.* at 859.)  A physical examination was normal.  (*Id.* at 861.)  The cardiologist

ordered imaging of Claimant's neck, which was performed on June 13, 2019, and revealed "no major vascular pathology." (*Id.* at 857, 862 (emphasis deleted).)

When Claimant returned to his primary care physician on July 17, 2019, he complained of "increased lower back pains." (*Id.* at 904.) A physical examination was normal. (*Id.* at 906–08.) The physician recommended chiropractic treatment. (*Id.* at 908.) Claimant attended three sessions with a chiropractor on July 24, 26, and 29, 2019. (*Id.* at 864–67.) Imaging of Claimant's lumbar spine dated July 24, 2019, revealed "mild degenerative changes" but was "negative for acute bony injury." (*Id.* at 892 (emphasis deleted).)

### 2. *Opinion Evidence: State-Agency Medical Consultants*

The state-agency medical consultant at the initial determination level performed an RFC assessment, in which she opined that Claimant could lift, carry, push, and pull fifty pounds occasionally and twenty-five pounds frequently and sit, stand, or walk for six hours in an eight-hour workday. (*Id.* at 130.) As support for these exertional limitations, the state-agency medical consultant remarked that Claimant had a BMI of 34.24. (*Id.*) She also opined that Claimant had no postural, manipulative, visual, communicative, or environmental limitations. (*Id.*) When asked to explain her RFC assessment, the state-agency medical consultant noted that imaging of Claimant's lumbar spine revealed "mild degenerative bony changes" but was "negative for acute bony changes," as was imaging of his right ankle and thoracic spine. (*Id.*) She also noted that his hypertension was stable and he had normal ejection fraction. (*Id.*) She stated, "Considering overall evidence including obesity and pain, supports Some reduction in RFC." (*Id.*)

The state-agency medical consultant at the reconsideration level affirmed the RFC assessment. (*Id.* at 141.) He noted that Claimant had an unremarkable stress test on July

25, 2017, and a carotid Doppler study on June 22, 2017, which revealed "[n]o significant carotid plaquing." (*Id.*) He also noted that imaging of Claimant's thoracic and lumbar spine showed mild degenerative disc disease, and physical therapy treatment notes dated September 11, 2017, showed "minor to minimal [range of motion] loss of lumbar spine." (*Id.*) The state-agency medical consultant remarked, "Physical symptoms and/or severity thereof are partially consistent with [medical evidence of record.] No new [medical evidence of record] to suggest increased functional limitations[.]" (*Id.*)

  *3. Medical Expert Hearing Testimony*

  During the administrative hearing, the ALJ heard testimony from a family medicine specialist about Claimant's physical impairments. (*Id.* at 95–105.) After confirming that the medical expert had not previously discussed the case with him, Claimant, or his attorney, and that she had reviewed the administrative record, the ALJ asked her to "share [her] analysis and state an opinion." (*Id.* at 95–96.) The medical expert noted that February 28, 2017, Claimant's alleged onset date, "was when he tripped and fell, and sprained his ankle and . . . the back pain started." (*Id.* at 96.) She also remarked that Claimant had a history of coronary artery disease and a heart attack, explaining that his coronary artery disease had "been fixed with two stents" and he did not complain of continuing negative effects and that "he had a normal nuclear scan" after his heart attack. (*Id.*) The medical expert mentioned that Claimant "continu[ed] to use nicotine, which constricts all of the arteries in his body" and that he had been evaluated for "carotid artery constriction," but testing revealed "no vascular disease." (*Id.* at 96–97.) Lastly, she noted that Claimant "did have a lot of back pain" and sought physical therapy and chiropractic treatment, which did not provide relief, but "then [the back pain] wasn't mentioned that much." (*Id.* at 97.) She concluded, "So, the only things that I really

find in the record, that might be bothering him, would be the ankle sprain and the residual of the ankle, which it was a sprain.  The X-ray was negative."  (*Id.*)

The medical expert explained that she considered "the various coronary heart listings," but "[t]hey don't apply because he doesn't have symptoms, nor evidence of a problem.  Only the past problem."  (*Id.* at 98.)  She also remarked that she "considered [Listings] 1.02 and 1.04 for the spine and his joints, but it doesn't come near requirements of the listing, nor does he equal, in my opinion."  (*Id.*)

The ALJ next asked the medical expert if she "believe[d] that there would be any significant work-related dysfunction, at all."  (*Id.*)  She replied, "I don't see how we could expect him to go back to lifting 400 pounds.  That's in the record, that he was . . . a chimney sweep . . . and was doing ladders and with . . . his heart disease—even though it's not symptomatic, and it's not causing anything now—that type of stress and that type of— and with the ankle sprain, I wouldn't want him having to balance, or be in chimneys and— that's too much."  (*Id.*)  The ALJ asked her if Claimant "would have the capacity to lift, push, pull, carry 50 pounds occasionally . . . and 25 pounds frequently."  (*Id.* at 98–99.)  She responded, "I don't even think 50.  I think that would be not good for his back, not good for his heart, not good for his ankle, or any of the things that he has even though they don't come up the listing."  (*Id.* at 99.)  The medical expert opined that Claimant could "[r]easonabl[y]" lift twenty pounds frequently and ten pounds occasionally.  (*Id.*)  She further opined that he could sit, stand, or walk for six hours; would have no impairment in using foot or hand controls or in reaching in all directions, handling, fingering, or feeling.  (*Id.* at 99–100.)  However, she opined that he could not climb scaffolds or "[s]omething really high, where he could fall."  (*Id.* at 100.)  The medical expert opined that Claimant "can balance normal walking, but not being challenged," but

would be able to stoop, kneel, crouch, and crawl.  (*Id.* at 101.)  When asked if she saw "any contraindication for being in proximity to moving[] mechanical parts or dangerous machinery," the medical expert responded, "As long as he's not dizzy."  (*Id.* at 101–02.)  She indicated the same would be true for his ability to operate a motor vehicle, but she affirmed that "there'd be [nothing] physically, which would prevent him from operating a vehicle."  (*Id.* at 102.)  The ALJ then asked her if Claimant needed restrictions for "temperature extremes of cold and hot, vibration, [or] pulmonary irritants," and she responded, "Pulmonary wouldn't be a good idea, with his heart condition."  (*Id.*)

Claimant's attorney also had an opportunity to question the medical expert, first asking her to confirm her testimony "that there had not been any residuals from the coronary artery disease."  (*Id.*)  She answered that Claimant had no angina and no chest pain, "but . . . he did have some muscle pain, and they changed his [medication] . . . and then he was okay on that."  (*Id.* at 102–03.)  Claimant's attorney asked her "if [she] had any comment about" Claimant's complaints of chest pain, and the medical expert stated that she did not "think [the chest pain] was coming from the coronary arteries."  (*Id.* at 103.)  Then, Claimant's attorney asked the medical expert about reports of "numbness of the feet," and she responded, "it was a complaint that they didn't follow-up on, right?" (*Id.* at 104.)  Claimant's attorney also asked the medical expert whether memory loss and confusion "can often be found with coronary artery disease."  (*Id.*)  She replied, "if that was happening in the throes of his original [heart attack].  Yes, because the oxygen can go really low, and the heart is not pumping right.  That can happen in the throes of the acute event.  But then, it isn't ever mentioned again."  (*Id.*)  Lastly, Claimant's attorney asked the medical expert about "some complaints . . . about radicular pain . . . from the low back, as well as some knee joint pain and the other joints that were offering symptoms."  (*Id.* at

13

104–05.)  She stated that "if it's not persisting . . . we have to assume it's not severe.  It's passing."  (*Id*. at 105.)

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits.  42 U.S.C. § 423(d)(1)(A).  The Social Security Administration has established a five-step sequential evaluation process to aid in this determination.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017).  The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  "The ultimate burden to prove disability lies on the claimant."  *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments.  *Id*. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001).  An individual impairment or

combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled."   20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.   *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).   "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'"   *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step.  *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e).  The claimant's RFC reflects "her ability to perform work despite her limitations."  *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work."  *Lewis*, 858 F.3d at 862.  "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the

claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this

point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through the date of the decision. (Tr. at 69.) He further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of his disability. (*Id.* at 70.) He found that Claimant's spinal disorder, history of coronary artery disease, obesity, and hyperlipidemia constituted "severe" impairments. (*Id.*) However, he found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 70–71.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform medium work . . . with further limitations." (*Id.* at 71–72.) He found that Claimant "can lift/push/pull/carry 50 pounds occasionally and 25 pounds frequently," "can sit for six hours in an eight-hour workday and can stand and/or walk for six hours in an eight-hour workday." (*Id.* at 72.) The ALJ determined that Claimant "can occasionally use foot controls and can frequently use hand controls" and "perform overhead reaching" and that he "can occasionally climb stairs, balance, stoop, kneel, and crouch, but he can never climb ladders or crawl." (*Id.*) He also found that Claimant "can never perform work at

unprotected heights, in proximity to moving mechanical parts of dangerous machinery, around pulmonary irritants, in temperature extremes, or with vibration," but "[h]e can occasionally perform work around humidity and wetness" and "can frequently operate a motor vehicle." (*Id.*)  Lastly, the ALJ found that Claimant "will be off task 10 percent of the time" in addition to normal work breaks. (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, he was unable to perform his past relevant work. (*Id.* at 75.)  He noted that Claimant is "an individual of advanced age" with "at least a high school education" and that "[t]ransferability of job skills [was] not material to the determination of disability." (*Id.*)  Because the ALJ determined that Claimant was unable to perform the full range of medium work, he enlisted a vocational expert to aid in his finding that Claimant is capable of working as a patient transporter, hand packager/retail bagger, or courier. (*Id.* at 75–76.)  As a result, the ALJ concluded that Claimant was not "under a disability . . . from February 28, 2017, through the date of this decision." (*Id.* at 77.)

## II.    *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.*

(alteration omitted).  "[T]he threshold for such evidentiary sufficiency is not high."  *Id.*
"In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh
conflicting evidence, make credibility determinations, or substitute [its] judgment for that
of the [ALJ]."  *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th
Cir. 1996)).  Even if "reasonable minds [could] differ as to whether a claimant is disabled,"
this Court upholds the ALJ's decision if it is supported by substantial evidence.  *Id.*
(quoting *Craig*, 76 F.3d at 589).

## III.   ANALYSIS

Claimant argues that the ALJ inadequately explained his reasoning when
evaluating the medical opinion evidence in this case.  (ECF No. 11 at 2–9.)  He further
asserts that the ALJ's RFC assessment is "[i]nconsistent" and "[i]ncoherent" because it
states that he is capable of medium work but also limits him to light work.  (*Id.* at 9–11.)
Claimant asks this Court to reverse the Commissioner's decision and award him benefits
or to reverse the Commissioner's decision and remand this matter to the ALJ.  (*Id.* at 11.)
The Commissioner responds that the ALJ properly evaluated the opinions according to
the applicable regulations, and his conclusions are supported by substantial evidence.
(ECF No. 12-1 at 8–21.)   He also argues that the limitation to light work was a
typographical error, and it is clear from the written decision that the ALJ found that
Claimant can perform medium work.  (*Id.* at 21–23.)

### A. *Opinion Evidence*

Claimant contends that the ALJ erroneously evaluated the opinions of his primary
care physician, the state-agency medical consultants, and the medical expert who testified
at the administrative hearing.  (ECF No. 11 at 2–9.)  When determining whether a
claimant is disabled, the ALJ is tasked with appraising the persuasiveness of "medical

19

opinions [and] prior administrative medical findings" by considering, first and foremost, their supportability and consistency, in addition to the medical source's relationship with the claimant and specialization and other factors such as the medical source's "familiarity with the other evidence in the claim or an understanding of [the] disability program's policies and evidentiary requirements." 20 C.F.R. § 404.1520c. In general, the better a medical source explains his opinion with references to objective medical findings and the more consistent that opinion is with the other evidence in the record, the more persuasive the ALJ should find that opinion. *Id.*

### 1. *Primary Care Physician*

Claimant argues that the ALJ erred by failing to mention his primary care physician's opinion that he "could not pick up more than twenty pounds." (ECF No. 11 at 3–4.) The Commissioner asserts that the physician's statements do not constitute a medical opinion because they deal with the ultimate issue of whether Claimant is disabled and because they were not intended as a permanent restriction but were instead an observation about Claimant's lifting abilities at a recent physical therapy appointment. (ECF No. 12-1 at 16–18.) "A medical opinion is a statement from a medical source about what [the claimant] can do despite [his] impairment(s) and whether [he] ha[s] one or more impairment-related limitations or restrictions" in his abilities to perform the physical, mental, and other demands of work activities and to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2). Although the primary care physician's ultimate conclusion that Claimant "is probably permanently disabled from doing his regular job of chimney sweep" does not fall within this definition, his observation that Claimant is "still not able to pick up more than 20 lbs." does. (Tr. at 440.) A medical source's statement about the claimant's ability to lift expressly constitutes a medical opinion. 20 C.F.R.

§ 404.1513(a)(2)(i).  And while it seems likely that the primary care physician gleaned the lifting restriction from Claimant's physical therapy treatment notes, there is no indication that he did not intend his statement to be an accurate representation of Claimant's limitations.

The ALJ must "articulate in [his] determination or decision how persuasive [he] find[s] all of the medical opinions . . . in [the claimant's] case record."  *Id.* § 404.1520c(b). In this case, however, the ALJ did not even mention the primary care physician's statements, let alone evaluate them.  The undersigned **FINDS** that this was error.

### 2.  *State-Agency Medical Consultants*

Claimant next asserts that the ALJ failed to adequately explain his reasons for accepting the state-agency medical consultants' opinions and suggests that their opinions are not reliable because they did not have access to his treatment records and other medical evidence of record that post-dated their review.  (ECF No. 11 at 4–6.)  Turning first to the latter argument, an ALJ is not required to reject the medical opinions and/or prior administrative medical findings supplied by a state-agency consultant simply because the state-agency consultant did not review the entire record before the ALJ.  *E.g.*, *Hunter v. Saul*, No. 1:19-cv-912, 2020 WL 6582497, at *9 (M.D.N.C. Nov. 10, 2020) ("State agency consultants provide RFC assessments at the initial and reconsideration levels of the claims process and thus necessarily offer their opinions prior to completion of the record."); *Pittard v. Berryhill*, No. 2:17-cv-71, 2018 WL 4677831, at *20 (E.D. Va. June 8, 2018) ("[B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision.  The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." (quoting *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d

21

356, 361 (3d Cir. 2011))), *adopted by* 2018 WL 4219193 (E.D. Va. Sept. 5, 2018).  As the Commissioner points out, this is true in every case, and ultimately the ALJ is tasked with evaluating "the consistency of state agency consultants' opinions with the record as a whole, including those records post-dating such opinions."  *Hunter*, 2020 WL 6582497, at *9 (emphasis deleted).

Claimant's contention that the ALJ's written decision does not sufficiently illustrate why he accepted the state-agency medical consultants' opinions is also without merit.  The ALJ explained that he found those opinions "persuasive" because the state-agency medical consultants "retain significant program knowledge," "have provided their opinions with explanation," and "their findings are supported by the totality of the evidence, as has been discussed and referenced elsewhere in this decision."  (Tr. at 75.) Claimant appears to take issue with the ALJ's statement about the opinions' consistency with the other evidence in the record, as he contends that the ALJ "provided no information as to which evidence [he] deemed persuasive" and did not reference "any evidence . . . as being supportive of the opinions."  (ECF No. 11 at 4.)  But the ALJ had already stated earlier in his RFC assessment that Claimant's "allegations of debilitating physical health symptoms are inconsistent with the clinical findings that are generally mild to moderate," his "routine and conservative medical treatment and his high functioning activities of daily living, which does [sic] include participation in all personal care."  (Tr. at 72–73.)  He then summarized the medical evidence of record and stated, "The claimant's symptoms have been managed relatively conservatively.  While cardiac stenting was necessary, the claimant's conditions have otherwise not required surgical intervention or pain management.  Although the claimant at times certainly in my view does experience pain, there is no evidence of muscle atrophy, significant weight loss, gross

instability, or neurological deficits generally associated with prolonged severe pain on a regular and continual basis." (*Id*. at 74.) In other words, the ALJ's written decision clearly reflects why he agreed with the state-agency medical consultants' opinions. The undersigned **FINDS** no error.

### 3. *Testifying Medical Expert*

Lastly, Claimant argues that the ALJ relied on "baseless and circumstantial reasoning" to reject the opinions of the medical expert who testified at the hearing. (ECF No. 11 at 6–8.) The ALJ explained that her opinions were "partially persuasive" and stated that they were "a partial basis in the crafting of the claimant's residual functional capacity." (Tr. at 74.) He noted, however, that he "departed from [the medical expert's opinions] as supported by the record, in some instances increasing capabilities and in others reducing them." (*Id*.)

The only area in which the ALJ disagreed with the medical expert and included less favorable findings than she recommended in his RFC assessment is Claimant's ability to lift. Specifically, she testified that he could "[r]easonabl[y]" lift twenty pounds occasionally and ten pounds frequently, but the ALJ determined that he could lift fifty pounds occasionally and twenty-five pounds frequently. (*Id*. at 72, 99.) The ALJ indeed remarked that the medical expert's opinion was "rather conjectural" and that she "focused less on the claimant's overall condition and residual functional findings since February 28, 2017 and for any consecutive 12-month period since then, but rather on actions she (as if she were his physician) would prefer the claimant not engage in to avoid recurrence or exacerbation." (*Id*. at 74–75.) But contrary to Claimant's suggestion, these statements were not the sole basis for his rejection of the lifting restriction. Instead, the ALJ reasoned, "in the key area of lifting, carrying, pushing and pulling, the doctor's findings

are not supported by the objective medical findings." (*Id.* at 75.) He had already elaborated on those objective findings earlier in his evaluation of the medical expert's opinion, noting that she testified "that while the objective record certainly supported a history of coronary artery disease, it did not establish any significant residuals," and "that while the record did establish complaints of musculoskeletal problems with some symptoms of pain and tenderness, overall objective findings were no more than mild" and "[p]hysical examinations were generally within normal limits." (*Id.* at 74.) The undersigned **FINDS** that the ALJ's explanation is more than sufficient.

   *B. RFC Assessment*

   Claimant also argues that the ALJ's RFC assessment is faulty because it is not clear whether the ALJ intended to limit him to light work or medium work. (ECF No. 11 at 9–11.) After stating in the heading of the RFC assessment section of his written opinion that Claimant "has the [RFC] to perform medium work," the ALJ indeed wrote, "An analysis of the objective evidence demonstrates that the claimant's [RFC] limits her to light exertional work, as explained further herein." (Tr. at 72.) But the fact that this is the only mention of light work in the entire written decision despite multiple references to medium work, coupled with the use of an incorrect pronoun, demonstrates that the ALJ did not intend to restrict Claimant to only light work. The ALJ made no specific findings corresponding to such a limitation; in fact, he expressly rejected the opinion of the medical expert who testified at the hearing that Claimant could lift only twenty pounds frequently and ten pounds occasionally—*i.e.*, that he could perform only light work. (*Id.* at 74–75.) *See* 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.").

Put simply, it is apparent from the context in the written decision that the reference to light work in the RFC assessment was an inadvertent misstatement that was not intended as a specific factual finding. Such errors generally do not require remand. *See Howell v. Saul*, No. 6:20-cv-765-CMC-KFM, 2021 WL 1178654, at \*8 (D.S.C. Mar. 3, 2021), *adopted by* 2021 WL 1177130 (D.S.C. Mar. 29, 2021). However, in light of the undersigned's recommendation that this matter be remanded for further evaluation of Claimant's primary care physician's opinion about his lifting abilities, any discrepancy in the RFC assessment will likely be resolved.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Claimant's request to reverse the Commissioner's decision (ECF No. 11), **DENY** the Commissioner's request to affirm his decision (ECF No. 12-1), **REVERSE** the final decision of the Commissioner, and **REMAND** this action for further proceedings.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Berger.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: June 30, 2021

Dwane L. Tinsley
United States Magistrate Judge